

FILED

2017 APR 13 PM 1:29

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

16-128

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RAYNOR MARKETING, LTD.,

                 Plaintiff,

vs.

Civil Action No: 3:17-cv-436-J-39 PDB

THE PHOENIX INSURANCE COMPANY
and LIBERTY MUTUAL INSURANCE COMPANY,

                 Defendants.

-------------------------------------------------------------------

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff RAYNOR MARKETING, LTD., (hereinafter "Plaintiff" or "Raynor") sues Defendants THE PHOENIX INSURANCE COMPANY (hereinafter "Phoenix") and LIBERTY MUTUAL INSURANCE COMPANY (hereinafter "Liberty Mutual") for money damages and equitable relief and requests trial by jury. Plaintiff alleges:

## NATURE OF THE ACTION

1.    Plaintiff brings this action for damages, and other legal and equitable remedies, resulting from the acts and omissions of Phoenix and/or its authorized representative, Travelers Insurance Company (hereinafter "Travelers"), and Liberty Mutual in denying coverage under certain policies of insurance Plaintiff purchased from Phoenix and Liberty Mutual (collectively the "Subject Policies"); and as a result of Travelers' bad faith in delaying the settlement of a claim to the detriment of Plaintiff.

## JURISDICTION AND VENUE

2.     This action is filed under and pursuant to 28 U.S.C. § 1332, in that Plaintiff and Defendants are residents of different states and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

3.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

4.     At all relevant times herein, Plaintiff Raynor is a corporation incorporated under the laws of the State of New York, with its principal place of business at 525 Hempstead Turnpike, West Hempstead, New York 11552.

5.     At all relevant times herein, Defendant Phoenix is a corporation incorporated under the laws of the State of Connecticut, with its principal place of business at One Tower Square, Hartford, Connecticut 06183.

6.     At all relevant times herein, Defendant Liberty Mutual is a corporation incorporated under the laws of the State of Massachusetts, with its principal place of business at 175 Berkeley St., Boston, Massachusetts 02116.

## FACTS COMMON TO ALL CAUSES OF ACTION

7.     At all relevant times herein, Plaintiff Raynor engages in the business of manufacturing, marketing, sales and the wholesale distribution of office seating products.

8.     For good and valuable consideration, Raynor procured from Defendant Phoenix a certain Comprehensive General Liability policy of insurance ("Phoenix

Policy"), bearing number Y-630-7075X381-PHX-12, that was in full force and effect for the period April 7, 2012 through April 7, 2013.  A copy of the Phoenix Policy is attached as Exhibit "A".

9.      The Phoenix Policy provided primary coverage to Raynor up to a limit of $1,000,000.00 per occurrence.

10.     The Phoenix Policy contained a coverage endorsement entitled "Manufacturers and Wholesalers XTend Endorsement - New York" (Form CG F2 05 11 03), Section B. "Blanket Broad Form Vendors Coverage" (hereinafter "Broad Form") states:

> WHO IS AN INSURED (SECTION II) is amended to include as an insured any person or organization (referred to below as "vendor") with whom you have agreed in a written contract, executed prior to loss, to name as an additional insured, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business.

11.     For good and valuable consideration, Raynor procured from Defendant Liberty Mutual a policy of insurance ("Liberty Mutual Policy"), bearing number TH7-621-094128-012, that was in full force and effect for the period April 7, 2012 through April 7, 2013, wherein it provided umbrella liability coverage to Raynor up to a limit of $5,000,000.00 per occurrence in excess of the $1,000,000.00 policy issued by Phoenix. The Liberty Mutual Policy is attached as Exhibit "B".

12.     Specifically, in the Liberty Mutual Policy, the provision entitled "Commercial Liability – Umbrella Coverage Form" (Form LCU 00 01 11 10) Section II. "Who is an Insured" states:

c. Any person or organization included as an additional insured under "underlying insurance", but not for broader coverage than is provided by the "underlying insurance". When coverage provided to an additional insured is the minimum amount of insurance required by the contract or agreement, less any amounts payable by any "underlying insurance" or otherwise retained.

13.    Prior to the issuance of the Subject Policies, Plaintiff Raynor entered into

the Vendor Purchasing Profile Agreement (hereinafter the "Vendor Agreement") with

Office Depot, Inc. ("Office Depot"), which contains the following indemnity provision:

4. Indemnity. With respect to any and all of the Products covered by this Agreement, Vendor agrees to defend, indemnify and hold harmless Office Depot (inclusive of Office Depot's subsidiaries and affiliates, their successors and assigns) at Vendor's expense from and against any claim, charge, demand, proceeding, suit, liability, loss, cost, expense, order, decree, attorneys fees, court costs, trial or appeal and judgments including damages of any kind resulting from, arising out of or in connection with: (a) any actual or claimed personal injury (including death), property damage or loss of any nature whatsoever alleged to have occurred as a result of the use of any of the Products covered by this Agreement, (b) any defect in material, workmanship or design, … (e) any negligent or wrongful act or omission committed by Vendor …. Office Depot shall have the right to participate and be represented in any such action, suit or proceeding by its own attorneys at its own expense.

…

6. Insurance. During the term of this Agreement, Vendor is required to carry product liability insurance with a carrier(s) acceptable to Office Depot. Vendor shall include Office Depot as an additional insured under Vendor's liability insurance policy and provide evidence thereof. No such insurance policy shall be cancelable or materially modified without Office Depot receiving at least thirty (30) days prior written notice. Vendor shall provide Office Depot a copy of Vendor's certificate of insurance prior to the Effective Date and shall provide proof of its compliance with this Section 6 upon Office Depot's reasonable request. The Certificate of Insurance shall include the following:

a.    Commercial   General   Liability   including   Product Liability/Completed Operations Hazard within minimum

4

limits of $1,000,000 per occurrence/$5,000,000 aggregate minimum.

b.   Broad form vendor's endorsement naming Office Depot, its subsidiaries and affiliates as an additional insured.

…

14.   Pursuant to the terms of the Vendor Agreement and the "insured" provisions contained in the Phoenix Policy, Office Depot was an additional insured under the Phoenix Policy.

15.   Pursuant to the terms of the Vendor Agreement and the provisions contained within the Liberty Mutual Policy, Office Depot was an additional insured under the Liberty Mutual Policy.

16.   On or about June 12, 2008, Plaintiff Raynor and Office Depot fully executed the above-referenced Vendor Agreement that set forth the terms and conditions for the Raynor-Office Depot relationship and which included the provision in which Raynor agreed to defend and indemnify Office Depot with respect to any lawsuits arising from any of Raynor's products sold by Office Depot.

17.   On or about August 2, 2011, Plaintiff Raynor and Office Depot entered into the Office Depot Purchase Order agreement (hereinafter the "2011 Purchase Order Agreement"), wherein Office Depot agreed to purchase Raynor products to sell at Office Depot stores.

18.   At all relevant times herein, Raynor, pursuant to the Vendor Agreement, sold various seating products to Office Depot, including the Real Space Pro 9000 Quantum Chair (hereinafter "Quantum Chair").

19.     On or about October 16, 2012, while the Subject Policies were in full force and effect, an individual, James Lee, a customer of Office Depot, purchased the Quantum Chair.  James Lee was sitting in the Quantum Chair when it broke causing James Lee to fall and injure his back (the "Loss").

20.     On or about October 25, 2012, James Lee contacted Raynor and Office Depot separately regarding the broken Quantum Chair.

21.     On or about October 26, 2012, Office Depot notified Raynor that it had been contacted by James Lee and to confirm that Raynor would take over the handling of James Lee's claim.

22.     On or about October 26, 2012, Raynor sent a reply to James Lee stating it would forward the information he provided to its insurance company, Travelers, and that Travelers would be in contact with him regarding his situation.

23.     Raynor timely notified Travelers, of which Phoenix is a subsidiary, about the Loss.  Hereinafter, Travelers and Phoenix will be collectively referred to as "Phoenix."

24.     On or about October 31, 2012, after receiving notice of the Loss, Phoenix assigned an adjuster, Rudy Ruschmann, to handle James Lee's claim.

25.     On or about April 10, 2014, James Lee and his wife, Peggy Lee (hereinafter collectively "Lee"), through their attorney Curry Pajcic, Esq., sent a settlement demand letter and package to Phoenix in connection with the injury Lee suffered.  In the settlement demand letter and package, Lee proposed a settlement amount of $2,000,000.00.

26.    On or about April 18, 2014, Phoenix notified Raynor that it had reassigned the Lee claim to a different adjuster, Jon Nawrocki (hereinafter "Nawrocki"), who was the point of contact at Phoenix for Raynor and Office Depot regarding the Loss.

27.    On or about April 23, 2014, Nawrocki sent correspondence to Raynor stating that the Phoenix-appointed attorney who was assigned to defend the Lee claim was Bert Rasmussen, Esq. from the Law Office of Jack D. Evans.

28.    On or about April 30, 2014, Nawrocki sent a letter in response to Pajcic which acknowledged the receipt of Lee's settlement demand letter and package. Nawrocki's letter also expressed Phoenix's intention to enter into settlement discussions after completing an investigation into the Loss and requested that Lee cooperate with the investigation. Nawrocki also alerted Pajcic to the existence of the Liberty Mutual Policy.

29.    On or about April 30, 2014, Raynor's corporate counsel sent a letter to Phoenix requesting that separate counsel be appointed by Phoenix to both Raynor and Office Depot for the claim brought by Lee. Further, Raynor explained to Phoenix that based on past claims involving the Quantum Chair, Office Depot and Raynor, they were aware that there are conflicts that would arise if one attorney and/or law firm represented both parties in a Quantum Chair Action.

30.    Subsequently, Phoenix reassigned the specific defense for Raynor of the Lee claim to the law firm of Quintairos, Prieto, Wood & Boyer, P.A.

31.    On or about May 23, 2014, Lee brought suit in Duval County against Plaintiff Raynor and Office Depot for personal injury from the Loss. Pursuant to the complaint, Lee alleged that he suffered harm as a direct result of Raynor's negligence,

Office Depot's negligence, strict liability of Raynor, strict liability of Office Depot and breach of implied warranty of Office Depot, *James Lee and Peggy Lee vs. Raynor Marketing, Ltd., and Office Depot, Inc.*, case number 2014CA-3588 (hereinafter "Underlying Action").

32.     On or about August 15, 2014, Nawrocki sent correspondence to Office Depot stating that Phoenix agreed to provide defense and indemnification for Office Depot in the Underlying Action. Nawrocki directed Office Depot to contact the Phoenix-appointed counsel for Raynor to facilitate a substitution of counsel for Office Depot to the Phoenix-appointed counsel.

33.     On or about August 21, 2014, Office Depot replied to Nawrocki and expressed its reservations with the same counsel representing Raynor and Office Depot based on experiences in prior litigation. Office Depot requested that Phoenix consider keeping Office Depot's counsel, the law firm of Wicker, Smith, O'Hara, McCoy & Ford, P.A., as representation for Office Depot.

34.     On or about August 21, 2014, Nawrocki sent correspondence to Office Depot stating Phoenix's position that while it agreed to keep Wicker, Smith, O'Hara, McCoy & Ford, P.A. as Office Depot's counsel and would continue to defend Office Depot in the Underlying Action, it would only provide indemnity for Office Depot to the extent of Raynor's negligence in the Loss.

35.     On or about August 25, 2014, Liberty Mutual sent correspondence to Nawrocki and Raynor's Phoenix-assigned counsel stating that it was aware, as the

8

umbrella policy carrier with limits of $5,000,000.00 excess to the primary insurance policy issued by Phoenix, that Lee had a very substantial injury claim.

36.     On or about September 3, 2014, Office Depot sent a letter to Nawrocki expressing its concerns with Phoenix's position regarding coverage and its tactic to conduct fact discovery rather than expeditiously trying to settle the Underlying Action. In its letter, Office Depot warned that fact discovery would actually benefit Lee's claim against Raynor and Office Depot and called for the parties in the Underlying Action to enter into early mediation to resolve the claims.

37.     On or about September 9, 2014, Nawrocki sent a reply to Office Depot restating Phoenix's positions regarding coverage and its tactic to conduct comprehensive discovery and then explore resolution of the Underlying Action with Lee in conjunction with Office Depot.  Nawrocki stated it was Phoenix's belief that Raynor and Office Depot would be best served with all parties having as much information as possible before making decisions regarding resolution of the Underlying Action.

38.     On or about September 23, 2014, Nawrocki sent correspondence to Office Depot stating that Phoenix would only provide indemnity for Office Depot to the extent of Raynor's negligence for the claims in Lee's complaint for Office Depot's negligence and Office Depot's strict liability.  Further, Nawrocki provided that there would be no indemnity for the claim in Lee's complaint for the breach of implied warranty against Office Depot.

39.     On or about April 29, 2015, David Lee, a major case specialist at Travelers who was handling the claims of Office Depot with respect to its status as an

9

additional insured under Raynor's Phoenix Policy, sent Nawrocki a letter seeking to coordinate discovery efforts between Raynor and Office Depot as well as making known the desire of an early resolution effort in the Underlying Action.

40.     David Lee warned Nawrocki that the value of the Underlying Action would escalate substantially as Plaintiff Lee learned more about the other cases involving the Quantum Chair through the discovery process and that any delays in resolution efforts predicated on outstanding discovery would be advantageous for Lee and harmful to the interests of the insureds, Raynor and Office Depot.

41.     David Lee supported his position based on Travelers' substantial history on prior related claims and stressed to Nawrocki the need to focus on early resolution efforts to mitigate the exposure to both of their clients.

42.     On or about September 30, 2015, a Notice of Mediation was filed in the Underlying Action and set a mediation date for November 30, 2015.

43.     On or about October 30, 2015, Lee, through Pajcic, sent a letter entitled "Mediation Statement and Offer to Settle," in which, as predicted by David Lee, the plaintiffs now demanded $6,000,000.00 to settle the Underlying Action.

44.     On or about November 10, 2015, Office Depot, through its Assistant General Counsel Alicia Trinley, Esq., wrote to Nawrocki and shared its concern about Phoenix's conduct in the handling of the Underlying Action.

45.     In the letter Trinley recounted that before the Underlying Action was filed Lee made a settlement demand of only $2,000,000.00. The letter further stated that Office Depot disagreed with Phoenix's position that Phoenix only would indemnify

Office Depot under the policy to the extent of Raynor's negligence and requested that Phoenix provide an immediate explanation as to why Office Depot, as an additional insured under the Phoenix Policy, would not be provided full coverage as set forth in the policy.

46.     On or about November 12, 2015, Nawrocki responded to Office Depot's November 10, 2015 correspondence with reference to emails Nawrocki sent on August 21, 2014 and September 23, 2014 that stated Phoenix's position regarding coverage was based on the allegations set forth in Lee's complaint. Further, Nawrocki stated that there was no indemnification language in the Raynor-Office Depot contract and that Office Depot only had additional insured status through the Broad Form endorsement of the Phoenix Policy.

47.     On or about November 12, 2015, Nawrocki forwarded to Raynor the November 12, 2015 response and chain of emails he sent to Office Depot.

48.     On or about November 27, 2015, Office Depot, through its attorney, sent a letter to Phoenix and Liberty Mutual requesting that both re-evaluate and change their position that they only owe an obligation to indemnify Office Depot to the extent of Raynor's negligence and that Phoenix and Liberty Mutual should settle the Underlying Action on behalf of the insureds, Raynor and Office Depot, within policy limits.

49.     Once again, Office Depot expressed the position that Phoenix's failure to settle the Underlying Action early would continue to result in extreme prejudice to Office Depot as supported by the Lee's tripling their settlement demand.

11

50.     In spite of Phoenix's failure to settle the case at that point, Office Depot stated that Phoenix and Office Depot would again have the opportunity to settle the Underlying Action at the mediation on November 30, 2015. Thereby, Office Depot requested that Phoenix and Liberty Mutual settle the Underlying Action on Office Depot's behalf within their respective policy limits at the mediation and that failure to do so would continue to subject Phoenix and Liberty Mutual to breach of contract and bad faith claims.

51.     On or about November 30, 2015, the parties in the Underlying Action participated in mediation, including representatives from Phoenix and Liberty Mutual.

52.     Nawrocki, as Phoenix's representative, openly stated at mediation that Phoenix valued the Lee's case at $1,500,000.00, but would only contribute $750,000.00 because Phoenix attributed 50% of the negligence to Raynor and the remaining 50% to Office Depot.

53.     On or about December 1, 2015, Raynor, through its personal counsel Martin Marcus, Esq., had a telephone conference with Joseph P. Covert of Liberty Mutual during which Raynor expressed its concern regarding the legal impasse involving coverage issues and stressed that it was Raynor's position that Office Depot was fully covered under the Subject Policies as an additional insured. Further, Raynor stated that it fully expected Liberty Mutual, in coordination with Phoenix, to resolve the coverage issue promptly to allow the parties in the Underlying Action to yet again attempt to settle the lawsuit.

54.     On or about December 4, 2015, Office Depot, through its counsel, sent a letter to Phoenix and Liberty Mutual expressing its frustration with the actions, or lack thereof, by Phoenix and Liberty Mutual in resolving the Underlying Action, including during the mediation.  Office Depot was displeased with Phoenix and Liberty Mutual during mediation because neither consulted with Office Depot concerning any offer to resolve the Underlying Action on its behalf.

55.     On or about December 7, 2015, Office Depot, through Ms. Trinley, sent correspondence to Raynor expressing its disappointment that the Underlying Action had not yet settled and also reminded Raynor of its obligation to defend and indemnify Office Depot such that if Office Depot was required to contribute any money towards settlement that Raynor would be contractually obligated to fully reimburse Office Depot.

56.     On or about December 22, 2015, Nawrocki, in response to Office Depot's December 4, 2015 letter, reasserted Phoenix's position that the Phoenix Policy limited "Office Depot's insured status to those claims for bodily injury which arise out of Raynor's product," and not an unlimited insured status.

57.     On or about December 23, 2015, Liberty Mutual sent a reply to Office Depot's December 4, 2015 letter, wherein Liberty Mutual asserted that there was no requirement contained in the 2011 Purchase Order for Raynor, and thus Liberty Mutual, to provide excess coverage to Office Depot, that the Phoenix Policy satisfied any insurance obligations by Raynor towards Office Depot and that the Liberty Mutual Policy was not implicated with respect to the alleged liabilities of Office Depot in the Underlying Action.

58.     On or about February 2, 2016, Phoenix sent a letter to Raynor expressing its position that, even as an additional insured, Office Depot did not enjoy the same coverage protection as the named insured Raynor.   Therein, Phoenix asserted that exclusions under the Broad Form limited the coverage that Phoenix was contractually obligated to provide.

59.     Further, Phoenix stated that the agreement entered into by Office Depot and Raynor contained no indemnification language or any language that required Office Depot to have primary coverage on the Phoenix Policy.

60.     Additionally, Phoenix asserted that, based on its evaluation of Raynor's potential liability exposure, the independent joint liability of both Office Depot and James Lee and causation issues from James Lee's medical history pre-dating the loss in the Underlying Action, Phoenix was not in a position to tender the $1,000,000.00 policy limit.

61.     On or about February 23, 2016, Raynor, in a letter, again communicated to Phoenix its need to settle the Underlying Action immediately so that "[Raynor] can attempt to rebuild its business relationship with [Office Depot]."   Additionally, Raynor set forth various grounds why Phoenix's position that policy exclusions applied to exclude Office Depot from coverage was erroneous and that Phoenix's refusal to change its position constituted bad faith.

62.     In support of its position that Office Depot was covered under the Phoenix Policy, Raynor specifically addressed each exclusion under the Broad Form and provided

reasoning as to why none of those exclusions applied to bar coverage to Office Depot for the Loss.

63.     Further, Raynor provided legal precedence, including cases interpreting New York law, to illustrate how the courts have interpreted the Broad Form language and exclusions contained in the Phoenix Policy and how those court holdings support Raynor's position that Phoenix's indemnity obligation to Office Depot under the Phoenix Policy is not limited to Raynor's negligence.

64.     On or about March 3, 2016, Phoenix, through Nawrocki, replied to Raynor's February 23, 2016 letter and maintained its position regarding coverage for Office Depot.  Further, Phoenix expressed that its coverage analysis was based on the allegations contained in Lee's complaint in the Underlying Action and statements provided by Lee and Lee's attorney.

65.     On or about March 16, 2016, Raynor replied to Phoenix's March 3, 2016 correspondence stating that Phoenix's ongoing refusal to change its position put the interests of Raynor, Phoenix's insured, at risk.  Again, Raynor reiterated to Phoenix that Phoenix's position regarding coverage for Office Depot was erroneous and that Phoenix's refusal to indemnify Office Depot would put Phoenix's insured at risk of serious financial harm.

66.     On or about March 24, 2016, the parties to the Underlying Action, including representatives from Phoenix and Liberty Mutual, participated in a second mediation in attempt to resolve the Underlying Action.

67.     The Liberty Mutual representative shared that it was under orders to not speak a word at the mediation until Phoenix tendered its policy containing a $1,000,000.00 limit.

68.     Phoenix reiterated its position that it valued the Loss at no less than $1,500,000.00, but would only contribute $750,000.00 towards a settlement of the Underlying Action.  Phoenix provided no support for its valuation of the Loss at $1,500,000.00, nor did it provide any reasoning as to how it came to determine that 50% of the fault, $750,000.00, was attributed to Raynor while the remaining 50% was attributed to Office Depot's independent actions, for which Phoenix would not contribute to settle the Underlying Action.  Once again, mediation was unsuccessful.

69.     On or about March 31, 2016, Nawrocki sent a letter reply to Raynor's March 16, 2016 letter in which Nawrocki claimed that the first time he became aware of the Vendor Agreement, which he erroneously stated was signed by the parties on December 30, 2007, was when he was provided a copy at the March 24, 2016 mediation. Even with the Vendor Agreement, and referencing language from its Indemnity provision, Phoenix refused to alter its coverage position and maintained that it would not defend or indemnify Office Depot for its independent negligence in the Underlying Action.

70.     On or about April 1, 2016, Raynor, through its counsel, informed Phoenix that Lee had significantly lowered its settlement offer from the March 24, 2016 offer at mediation.

71.     On or about April 4, 2016, Nawrocki replied that Phoenix would still maintain its position and only contribute $750,000.00 toward the settlement of the Underlying Action.

72.     On or about May 4, 2016, Raynor, through its counsel, again contacted Nawrocki in hopes of securing a settlement in the Underlying Action before the parties entered into expensive fact and expert discovery. Thereafter, Raynor provided an updated settlement offer from Lee and warned Nawrocki about the potential that a verdict at trial, given the renowned abilities of the Lee's attorney and potential future damages suffered by James Lee prior to trial that could be attributed to the Quantum Chair injury, could be in excess of Raynor's primary and excess coverage limits.

73.     On or about May 12, 2016, Phoenix agreed to increase its offer for settlement contribution from $750,000.00 to $850,000.00.

74.     On or about May 13, 2016, the Underlying Action settled for $2,100,000.00, with Phoenix contributing $850,000.00 and Raynor, based upon the Phoenix position, agreeing to fund the remaining $1,250,000.00 (hereinafter "the Settlement"). Liberty Mutual did not contribute to the Settlement of the Underlying Action.

75.     On or about June 29, 2016, pursuant to the Settlement, the Underlying Action was dismissed with prejudice by Court Order.

76.     On or about January 20, 2017, Raynor filed its Civil Remedy Notice of Insurer Violations, pursuant to Fla. Stat. § 624.155, with the Florida Department of Financial Services and mailed a hard copy of the Civil Remedy Notice to Nawrocki, as

the person representing the insurer who is the most responsible for and knowledgeable of the facts giving rise to the allegations, located at Travelers, as the parent company of Phoenix, at 2420 Lakemont Avenue, Orlando, Florida 32814. A copy of the filed Civil Remedy Notice is attached hereto as Exhibit "C".

77.     All conditions precedent to the filing of this action have occurred prior to the filing of this Complaint.

## COUNT I
(Breach of Contract – Defendant Phoenix)

78.     Plaintiff realleges paragraphs "1" through "77" as if set forth herein.

79.     The Phoenix Policy (Exhibit "A") was in full force and effect on October 16, 2012, the date which James Lee suffered the alleged injuries in the Underlying Action.

80.     Notwithstanding the fact that Plaintiff timely notified and submitted a claim to Defendant Phoenix under the Phoenix Policy and fully cooperated with Phoenix, Phoenix has failed to indemnify Plaintiff and its additional insured, Office Depot, for the loss.

81.     Under the Phoenix Policy, Phoenix had an obligation to tender its policy limits of $1,000,000 to settle the Underlying Action.

82.     By its failure to fully participate in the handling and resolution of the underlying claim, and failing to ultimately tender the limits of its policy, consistent with the terms of the Phoenix Policy, Defendant Phoenix materially breached its insurance contract with Plaintiff.

83.     As a direct and proximate result of Defendant Phoenix's breach, Defendant Liberty Mutual did not provide funds to resolve the underlying claim under

18

the excess Liberty Mutual Policy and Plaintiff sustained damages in excess of $150,000.00, in addition to attorneys' fees, costs, and any and all other incidental and consequential damages allowed by law. Plaintiff hereby demands and prays for attorneys' fees relative to this Count under Fla. Stat. § 627.428.

WHEREFORE, Plaintiff seeks a judgment for compensatory damages against Phoenix, including the award of prejudgment interest, costs, and any other damages sustained by Plaintiffs as result of Phoenix's breach of contract; its attorneys' fees pursuant to Fla. Stat. § 627.428, and any other damages the Court deems necessary and proper.

**COUNT II**
(Breach of Contract – Defendant Liberty Mutual)

84.   Plaintiff realleges paragraphs "1" through "77" as if set forth herein.

85.   The Liberty Mutual Policy (Exhibit "B") was in full force and effect on October 16, 2012, the date which James Lee suffered the injuries alleged in the Underlying Action.

86.   Notwithstanding the fact that Plaintiff timely notified and submitted a claim to Defendant Liberty Mutual under the Liberty Mutual Policy and fully cooperated with Liberty Mutual, Liberty Mutual has failed to participate consistent with the term of the Policy for the Loss.

87.   Defendant Liberty Mutual, well aware that the covered loss in the Underlying Action would exceed the primary coverage limit of $1,000,000.00 in the policy issued by Defendant Phoenix, failed to provide excess coverage to Plaintiff, pursuant to the terms of the Liberty Mutual policy.

88.     By its failure to participate in the handling and resolution of the

Underlying Action and make payment pursuant to the terms of the Liberty Mutual Policy,

Defendant Liberty Mutual materially breached its insurance contract with Plaintiff. As a

direct and proximate result of Defendant Liberty Mutual's breach, Plaintiff sustained

damages in excess of $1,100,000.00, in addition to attorneys' fees, costs, and any and all

other incidental and consequential damages allowed by law. Plaintiff hereby demands

and prays for attorneys' fees relative to this Count under Fla. Stat. § 627.428.

WHEREFORE, Plaintiff seeks a judgment for compensatory damages against

Liberty Mutual, including the award of prejudgment interest, costs, and any other

damages sustained by Plaintiffs as result of Phoenix's breach of contract; its attorneys'

fees pursuant to Fla. Stat. § 627.428, and any other damages the Court deems necessary

and proper.

## COUNT III
(Bad Faith Against Defendant Phoenix under Florida Statute § 624.155)

89.     Plaintiff realleges paragraphs "1" through "77" as if set forth herein.

90.     The Phoenix Policy was in full force and effect on October 16, 2012, the

date which James Lee suffered the injuries alleged in the Underlying Action.

91.     Pursuant to Fla. Stat. § 624.155(1)(b)(1), Phoenix was required to attempt

in good faith to settle claims when, under all the circumstances, it could and should have

done so, had it acted fairly and honestly towards its insured and with due regard for the

interests of its insured.

92.     Defendant Phoenix acted in bad faith when it failed to settle the Lee's

claims (hereinafter "Underlying Claims") against Plaintiff Raynor and Office Depot

20

when it could have and should have done so had it acted fairly and honestly toward Plaintiff Raynor and the additional insured Office Depot.

93.     Defendant Phoenix acted in bad faith when it failed to attempt in good faith to settle the Underlying Claims when, under all the circumstances, it could have and should have done so, had it acted fairly and honestly towards Plaintiff Raynor and the additional insured Office Depot and with due regard for their interests.

94.     Defendant Phoenix acted in bad faith when it failed to promptly settle the Underlying Claims when the obligation to settle became reasonably clear.

95.     Defendant Phoenix acted in bad faith when it refused to change its erroneous position that the additional insured coverage under the Phoenix Policy was limited to the extent of Raynor's negligence even after Plaintiff Raynor and the additional insured Office Depot provided documents and relevant case law to Phoenix to showing Phoenix's coverage position was erroneous.

96.     Defendant Phoenix acted in bad faith when it allocated fault in the Underlying Action to 50% Plaintiff Raynor and 50% Office Depot without justification or evidentiary support, and in a completely arbitrary manner.    In so doing, Phoenix thwarted any opportunity for the Underlying Action to settle without Plaintiff having to utilize its own funds.

97.     Defendant Phoenix acted in bad faith when it contributed less than 50% of the settlement amount in the Underlying Action and failed to exhaust the policy limits of the Phoenix Policy to settle the Underlying Action when it could have and should have

done so had it acted fairly and honestly toward Plaintiff Raynor and the additional insured Office Depot.

98.     At all relevant times, Defendant Phoenix was aware that the amount to settle the Underlying Action would be in excess of the Phoenix Policy limit.

99.     At all relevant times, Defendant Phoenix was aware that Plaintiff Raynor had excess insurance coverage with Liberty Mutual that would only be triggered if Phoenix exhausted the coverage limit of the Phoenix Policy.

100.    At all relevant times, Defendant Phoenix was aware that if it did not exhaust the coverage limit of the Phoenix Policy, the Liberty Mutual Policy would not be triggered and Plaintiff would be personally responsible for the balance of any judgment or settlement in the Underlying Action.

101.    As a direct and proximate result of Defendant Phoenix's acts and omissions, including the refusal to pay the policy limits of the Phoenix Policy to effect settlement of the Underlying Action, Defendant Liberty Mutual did not contribute to the settlement.  Therefore, under said circumstances, Raynor was forced to act in its own best interest and in a manner of self-preservation paid the remainder of the settlement from its own funds.

102.    Pursuant to Fla. Stat. § 624.155(4) and (8), Phoenix's failure to act in good faith toward its insured, Raynor, resulted in Raynor suffering damages.  Raynor's damages include any and all funds Raynor expended to effect settlement of the Underlying Claims, and any and all damages which were a reasonably foreseeable result of a Phoenix's bad faith, including but not limited to, court costs and attorneys' fees.

103.    Accordingly, as a result of Defendant Phoenix's bad faith, Plaintiff has sustained damages in excess of $1,250,000.00, not including attorneys' fees and costs, which Plaintiff hereby requests, pursuant to Fla. Stat. § 624.155(4).

**WHEREFORE,** Plaintiff demands judgment for any and all damages against Phoenix, pursuant to Fla. Stat. § 624.155, including its attorneys' fees and costs, and any other damages the Court deems necessary and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Raynor demands a trial by jury.

Dated: April 13, 2017

Respectfully Submitted,

**WEG AND MYERS, P.C.**
*Attorneys for Plaintiff*

By: 
Joshua L. Mallin
Trial Counsel
Weg and Myers, P.C.
52 Duane St., 2nd Floor
New York, NY 10007
(212) 227-4210
(212) 349-6702
jmallin@wegandmyers.com

23